IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 17, 2005 Session

## JAMES MICHAEL EDENFIELD v. KARA LEIGH COOPER EDENFIELD

Appeal from the Chancery Court for Knox County
No. 147462-2     Daryl R. Fansler, Chancellor

No. E2004-00929-COA-R3-CV - FILED OCTOBER 31, 2005

The chief point of contention in this bitterly fought divorce case involves the valuation and disposition of a one-half interest in a service company which the husband and his business partner founded and worked for during the marriage. Both parties had asked the court to award the husband the share of the business, and the wife had asked the court to award her the monetary equivalent of one-half its value. Instead, the trial court awarded the business to the wife, together with all the debt associated with it. The wife argues on appeal that actions by the husband rendered the company valueless and the distribution of property and debt was, consequently, inequitable. Because we find that the business had no value apart from the efforts of its principals, we modify the valuation of property and allocation of debt. Because of the modification, we remand the case to the trial court to reconsider the question of attorney fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed as Modified in Part, Vacated in Part, and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

Ronald L. Grimm, Mary L. Abbott, Knoxville, Tennessee, for the appellant, Lara Leigh Cooper Edenfield.

Denise Terry Stapleton, Morristown, Tennessee, for the appellee, James Michael Edenfield.

# OPINION

## I.

James Michael Edenfield and Kara Leigh Cooper Edenfield married in 1993. This was her first marriage and his second. A child, Cooper Michael Edenfield, was born of their marriage on July 29, 1997. The proof showed that both parties worked prior to and during their marriage, but as the birth of their child approached, the parties agreed that Ms. Edenfield would quit her job to take care of the child and Mr. Edenfield would undertake to support the family.

Ms. Edenfield was a college graduate and was only a few credits short earning an M.B.A. when Bristol University, which she had been attending, closed. She worked at several jobs after leaving school, at ever-increasing salaries, and had been earning $70,000 per year as an information technology consultant for Deloitte and Touche before Cooper was born.

Mr. Edenfield graduated from high school and attended college for a year and a half. After four years in the Air Force, he worked as a salesman for Clayton Homes and then as a car salesman and dealership manager. In 1995, he teamed up with Scott Lewis, a former employer, to found First Choice, a company that serves automobile dealerships by furnishing them with a variety of products, such as new car warranties, extended service contracts, credit insurance, alarms, chemicals, and "anything that a car dealership can sell a customer through the finance office."

First Choice had few assets of its own (a checking account, two fax machines, and cell phones) and no employees other than Mr. Lewis and Mr. Edenfield. The products it sold were supplied by other companies, and First Choice did not have exclusive contracts to sell those products. Neither did it have long-term or exclusive agreements with dealerships. First Choice essentially relied for all its revenue upon the salesmanship of its two principals, who operated out of the trunks of their cars. Most of that revenue was paid out to Mr. Edenfield and Mr. Lewis in the form of salaries. The company itself did not retain any significant amounts of capital.

Despite its lack of tangible assets, First Choice proved to be a successful source of income for its principals. Mr. Edenfield's tax returns show that in 1999 he earned $104,264 in salary from First Choice, and in 2000 he earned $116,253. He also received other benefits from the company, including health insurance, travel expense reimbursement, a retirement plan, and tickets to Nascar races for himself and his clients.

The parties lived well on Mr. Edenfield's income and spent their money freely, although they had to make some adjustments when Ms. Edenfield left her job. They did not manage to accumulate very much in the way of assets. The most valuable marital assets at the time of divorce were Mr. Edenfield's interest in First Choice and the marital home, which was encumbered by a large mortgage.

Mr. Edenfield's work involved a great deal of traveling. He admitted at trial that during his marriage he became involved in brief affairs and one-night stands with other women while he was on the road. In March of 2000, he met a woman with whom he wished to have a longer-term relationship. In May, Ms. Edenfield discovered her husband's affair with this woman. Mr. Edenfield left the marital home on or about May 31, 2000.

## II. PROCEEDINGS BELOW

Mr. Edenfield filed a Complaint for Divorce in the Chancery Court of Knox County on June 13, 2000, citing irreconcilable differences. Ms. Edenfield filed an Answer in which she denied that irreconcilable differences existed and asked the trial court to dismiss her husband's complaint. She subsequently filed a Counter-Complaint for divorce.

The parties entered into an Agreed Order establishing that Ms. Edenfield would remain the primary physical custodian of the child. The order also set out a visitation schedule for Mr. Edenfield and obligated him to pay child support in the amount of $1,335 per month. A later order added $3,197 in spousal support to Mr. Edenfield's obligation. In the fourteen months between the filing of the initial complaint and the divorce hearing, the parties participated in mediation and in at least three court proceedings to resolve disputes that had arisen between them.

The hearing was conducted on September 24 and 25, 2001. Six witnesses testified - the parties themselves, two certified public accountants, a psychologist, and Mr. Edenfield's girlfriend. Much of the testimony had to do with questions of fault, alimony, and visitation, but we will focus our discussion on the evidence related to property division, because those are the issues raised in this appeal.

The parties had purchased a home which they estimated had a value of between $215,000 and $240,000 at the time of trial. The amount owed on their mortgage was $216,000. The reason for the lack of equity in the home was that when Ms. Edenfield became pregnant, and the parties decided she should quit her job, Mr. Edenfield decided to sell his interest in First Choice and go back to work for a dealership so he could earn a steadier income. Scott Lewis reluctantly purchased Mr. Edenfield's interest in the company for $50,000.

For the next ten months, Mr. Edenfield tried unsuccessfully to buy into a dealership. The $50,000 was apparently spent during that time. Finally, Mr. Edenfield asked Mr. Lewis if he could buy his share of the company back. Mr. Lewis agreed to allow him to re-purchase his interest for $50,000 in cash and a $30,000 side note.[1] Mr. Edenfield used the available equity in the marital home to refinance and obtain the $50,000. He also used a home equity line of credit to finance the purchase of an Audi automobile.

---

[1] Although an issue at trial, the court's treatment of the $30,000 note is not involved in this appeal.

Ms. Edenfield asked to be awarded the marital home to allow the child to continue to live there, and Mr. Edenfield agreed. The proposed distribution in the parties' joint list of assets and debts states that Mr. Edenfield had no objection to Ms. Edenfield receiving the home, as long as he was not liable on the debt. Ms. Edenfield agreed to assume most of the debt, but not the portion incurred to buy back the interest in First Choice. The parties also agreed that Mr. Edenfield should retain his interest in First Choice, but Ms. Edenfield asked that Mr. Edenfield be required to pay her one-half the value of that interest over a period of time.

Not surprisingly, the parties offered very different estimates of the value of the business. Glenn Thompson, a C.P.A. who had provided accounting services to First Choice, was called by Mr. Edenfield and testified that the company had virtually no assets of its own, no employees other than Mr. Lewis and Mr. Edenfield, and that it did not have exclusive arrangements with any supplier or any dealership. Since the company relied for its income solely upon the salesmanship of its two principals and the relationships they established, Mr. Thompson testified that it was unlikely that any buyer would be willing to pay a substantial amount for a share in the company. He concluded that it therefore had no value, or only a nominal value of $5,000 or $10,000. Mr. Edenfield testified that First Choice had no value separate from the efforts of its two owners as salesmen.

Ms. Edenfield called C.J. Hulen, another C.P.A., who testified that a value could be placed on the company using the capitalization of income method. That method starts by considering a stream of benefits (chiefly personal income in this case), and then interpolates between several possible rates of return on assets (including the 30 year treasury bond rate and the small stock risk rate) to convert that stream into an enterprise value. Mr. Hulen's calculations resulted in a value of $344,780 for Mr. Edenfield's half of the business.

Asked if the company could survive without its principals, and thus whether a buyer could possibly be found for the company, Mr. Hulen testified that was possible. He suggested that a good salesman might be interested in acquiring the company, and that after a transition period, such a buyer might start earning sums comparable to those earned by Mr. Lewis and Mr. Edenfield.

Ms. Edenfield estimated the value of the company to be $500,000, based on a stock purchase agreement (also called a buy/sell agreement) that Mr. Edenfield and Mr. Lewis had executed in conjunction with life insurance policies that each had taken out on the other. The agreement provided that upon the death of a principal, the $250,000 insurance amount would be used to pay the decedent's spouse or beneficiary for the decedent's share in the company.

The intended result of the agreement was that upon the death of either principal, the surviving spouse would be able to partly replace the income the deceased principal had been earning, and the surviving principal would not find himself in an involuntary partnership with the decedent's widow. However, Mr. Thompson had testified that the buy-sell agreement did not represent the company's actual value because such agreements are commonly in excess of the value of the company involved.

### III. THE COURT'S RULING

This case took a surprising turn during closing argument, a turn foreshadowed by a question the court asked Mr. Hulen at the end of his testimony.

THE COURT: Mr. Hulen, just one thing for the Court's clarification. If the Court awarded Mrs. Edenfield Mr. Edenfield's shares in this corporation, would she then be receiving an asset worth $344,780.00?
THE WITNESS: If she got all of it.
THE COURT: All right. Thank you. You may step down.

During closing argument, Ms. Edenfield's attorney was discussing First Choice when the court again suggested that the question of value could be eliminated by simply awarding the share of the business to the wife. Ms. Edenfield's attorney appeared to have been taken aback by this suggestion, but the transcript indicates that he looked over at his client and she shook her head in a way that he and the trial court took to be assent.

MR GRIMM: Mrs. Edenfield is shaking her head over here --

THE COURT: Well, that seems to solve that issue. The Court will order that.

At the close of argument, the court announced that it was granting the divorce to Ms. Edenfield on the basis of her husband's adultery and inappropriate marital conduct. The judge also awarded her custody of the child, set out some ground rules for Mr. Edenfield's visitation, and stated that he was taking other matters under advisement. The court's decision as to the divorce, custody and visitation was memorialized on October 9, 2001 in a "Final Decree of Divorce."

To dispose of the remaining property and support issues, the court issued a Memorandum Opinion on November 19, 2001, setting forth its proposed resolution of the remaining issues. In that opinion, the trial court found that Ms. Edenfield should be awarded rehabilitative alimony of $3,000 a month for three years. As indicated in its announcement from the bench, the court indicated it would award the one-half interest in First Choice to Ms. Edenfield and valued it in accordance with Mr. Hulen's testimony at $344,780. The transfer of the business interest was to be accomplished by Mr. Edenfield delivering his stock certificates to Ms. Edenfield within thirty days of the entry of judgment and executing all documents necessary to transfer his interest in the corporation to her.

Almost all the remaining financial issues were affected by this decision. For instance, Ms. Edenfield had asked the trial court to grant her one-half of Mr. Edenfield's retirement account, which had a balance of about $10,200. The court reasoned that request should be denied because of the value of the property she was to be awarded. Ms. Edenfield had also incurred about $69,000 in attorney fees in the divorce and asked the trial court to order Mr. Edenfield to pay her fees. The court declined, because Ms. Edenfield would acquire an asset "valued in excess of $340,000."

Ms. Edenfield had also asked that Mr. Edenfield be made responsible for that part of the mortgage on the marital home that was attributable to the repurchase of the share of First Choice. The court held that the logic of the situation required a different result:

> Because Ms. Edenfield is receiving all of the assets associated with First Choice, Inc., it is appropriate that she should also assume any debt associated with the ownership of that corporation. Thus, the $50,000.00 that is included in the first mortgage of the marital residence will not be carved out of the first mortgage but will be assumed by Ms. Edenfield.

The trial court directed the parties to review the Memorandum Opinion and to file before December 11, 2001 any motion necessary to bring to its attention any issues regarding the division of marital property and marital debts that it had not addressed. On December 1, Ms. Edenfield filed a motion which involved health insurance, life insurance, and medical bills as well as a request that the court review its award of the one-half of First Choice to her, because it "lost its value because of circumstances beyond Plaintiff's control, and it is therefore unjust that Plaintiff be burdened with debt associated with that asset."

Ms. Edenfield claimed that First Choice had been administratively dissolved by the Secretary of State on September 15, 2000 (prior to the divorce hearing), that Mr. Edenfield had subsequently obtained other employment and was no longer working for First Choice, and that Scott Lewis had notified Ms. Edenfield that he was not interested in working for First Choice without Mr. Edenfield's presence as a shareholder and employee.

During the January 7, 2002 hearing on Ms. Edenfield's Motion, her attorney told the court that Mr. Edenfield was no longer working for First Choice. Mr. Edenfield's attorney informed the court that he had taken a job with a Hyundai dealership, at an income of $5,500 per month. Mr. Edenfield's attorney did not dispute wife's claims that First Choice had been administratively dissolved or that Scott Lewis was unwilling to work for First Choice without Mr. Edenfield's participation. After recounting the testimony at trial, the trial court stated:

> Now, as it turns out, it looks like in retrospect, Mr. Edenfield's accountant may have been the one that had the correct testimony in the case as opposed to Ms. Edenfield's accountant, at least that's what I'm hearing here today.

> I will just say this, if the Court altered its judgment in this case, it would only alter - - the only alternative, . . . would be to hold that the value of the stock in the corporation was worth nothing, and that that's exactly what Ms. Edenfield would take from the corporation, nothing.

> There's no in between ground with proof in this case. It's either worth nothing or it's worth $345,000. If she doesn't want the $345,000 worth of shares of stock, then she

says, I don't want them, he takes the $50,000 debt, he keeps his interest with the corporation, and everybody goes about their business. . . .

Now, you all may want to talk about this this morning and see if you want to amend it that way. I mean that's the only two choices the Court has in the case, and the record doesn't support me doing anything else.

Counsel for Mr. Edenfield suggested that, since no final judgment had been entered, that a judgment go down with "no change" from the memorandum opinion on the issue of the interest in First Choice. Ms. Edenfield's counsel asked the court to address the $50,000 debt attributed to the share of the business. The court responded that it would amend the judgment to value the business at zero, award the interest or stock in the business to Mr. Edenfield, and assign him the $50,000 debt.

Counsel for Mr. Edenfield stated he did not want the stock now since he had made other arrangements and argued that the court should just enter a judgment and "whatever happens happens." Counsel for Ms. Edenfield asked that the court put down a judgment consistent with its last proposal. A discussion ensued as to Ms. Edenfield's original request for division of the property. The trial court concluded by declining to change its original property distribution in the absence of an agreement between the parties to another resolution. On January 17, 2002, the court entered an order that awarded the one-half interest in First Choice to Ms. Edenfield along with the $50,000 debt attributed to its acquisition.

A final order was not filed in this case until May 8, 2003. The final order incorporated a parenting plan, which imposed a child support obligation of $1,445 per month on Mr. Edenfield. The property division in the final order was consistent with the court's prior orders.

Ms. Edenfield timely filed a Motion to Alter or Amend. The motion was accompanied by an affidavit in which Ms. Edenfield testified that Mr. Edenfield had deliberately destroyed any remaining value of her interest in First Choice by disparaging her to all the dealerships which had previously been his clients and by creating, with Scott Lewis, a new company called Dealer Services, Inc., in direct competition with First Choice. She stated the charter of this new corporation had been filed January 3, 2002. Consequently, she argued, Mr. Edenfield had impaired or destroyed the value of the asset and the property distribution was not equitable. The court denied her motion. This appeal followed.

## IV. PROPERTY DIVISION

Upon the dissolution of a marriage, courts are called upon to divide the assets the parties accumulated during the marriage, upon the request of either party. The court's first task is to classify the parties' property as either separate or marital, because only marital property is subject to equitable distribution. *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003); *Eldridge v. Eldridge*, 137 S.W.3d 1, 13 (Tenn. Ct. App. 2002). There is no dispute in the case before us that the one-half interest in First Choice was marital property.

After identifying the marital property, the trial court is charged with equitably dividing, distributing, or assigning the marital property in "proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1); *Jolly v. Jolly*, 130 S.W.3d 783, 785 (Tenn. 2004). The court is to consider all relevant factors in its distribution, including those listed in Tenn. Code Ann. § 36-4-121(c).[2] *Jolly,* 130 S.W.3d at 786; *Flannary*, 121 S.W.3d at 650. The court may consider any other factors necessary in determining the equities between the parties, Tenn. Code Ann. § 36-4-121(c)(11), except that division of marital property is to be made without regard to marital fault. Tenn. Code Ann. § 36-4-121(a)(1).

The court's distribution of property is to be achieved by considering and weighing the most relevant factors in light of the unique facts of the case. *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988); *see also Flannary*, 121 S.W.3d at 605; *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003). An equitable distribution is not necessarily an equal one, and a division is not rendered inequitable simply because it is not precisely equal. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002); *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998); *Word v. Word*, 937 S.W.2d 931, 933 (Tenn. Ct. App. 1996). Similarly, equity does not require that each party receive a share of every piece of marital property. *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998); *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

Decisions regarding division of marital property are fact-specific, and many circumstances surrounding the property and the parties play a role. A trial court has a great deal of discretion concerning the manner in which it divides marital property. *Jolly*, 130 S.W.3d at 785; *Flannery*, 121 S.W.3d at 650; *Smith v. Smith*, 984 S.W.2d 606, 609 (Tenn. Ct. App. 1997). Appellate courts ordinarily defer to the trial court's decision unless it is inconsistent with the factors in Tenn. Code Ann. §36-4-121(c) or is not supported by a preponderance of the evidence. *Jolly*, 130 S.W.3d at 785-86.

---

[2]These factors are:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

-8-

The division or distribution of marital property includes the division of marital debt. *Robertson*, 76 S.W.3d at 341. Like marital property, marital debt is subject to equitable distribution. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). In making an equitable distribution of existing marital debt, the trial court should consider the following factors: (1) which party incurred the debt, (2) the purpose of the debt, (3) which party benefitted from incurring the debt, and (4) which party is better able to repay the debt. *Alford*, 120 S.W.3d at 814; *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989). Application of these factors is designed to insure a fair allocation and protection of one spouse from the personal excesses of the other. *Alford*, 120 S.W.3d at 814.

Where there is really no dispute that the debt was incurred by both parties for the benefit of the family or to acquire a marital asset, all the listed factors are not necessarily relevant as there is no issue of protection from a spouse's excesses. Courts often allocate a debt that is associated with a specific asset to the party who is awarded that asset. *Kinard*, 986 S.W.2d at 233; *Mondelli*, 780 S.W.2d at 773.

## V. Valuation of Marital Property

After classifying property as marital or separate, the court's next task is to value the assets so that an equitable distribution can be accomplished. The valuation of a marital asset is a question of fact to be determined by considering all the relevant evidence. *Kinard*, 986 S.W.2d at 231; *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). If the evidence the parties present as to value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence. *Powell v. Powell*, 124 S.W.3d 100, 105-06 (Tenn. Ct. App. 2003); *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App.1995). On appeal, we presume the trial judge's factual determinations as to value are correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App.1996).

Where two experts testify on the question of valuation of an asset, the trial court is not required to accept the testimony of either expert. *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 264 (Tenn. Ct. App. 1990); *Coppage v. Coppage*, No. E2000-01630-COA-R3-CV, 2001 WL 394837, at *3 (Tenn. Ct. App. April 19, 2001). In that situation, "[i]n the final analysis, the credibility of the experts and the weight to be given their testimony were questions for the trier of fact." *Id.* The valuation method used by the expert is an important factor in the degree of reliance a court should place on it.

Determining the value of a closely held corporation is not an exact science. *Wright v. Quillen*, 909 S.W.2d 804, 809 (Tenn. Ct. App. 1995); *Wallace*, 733 S.W.2d at 107. It can be a difficult exercise for any court. A number of acceptable methods exist, and the court should chose an acceptable method that best fits the characteristics of the business at issue. In *Blasingame v. American Materials, Inc.,* 654 S.W.2d 659 (Tenn. 1983), our Supreme Court discussed the valuation of closely held corporations in the context of establishing the rights of minority shareholders. The Court noted that there were three widely-recognized methods: the fair market approach, the value of assets approach, and the capitalization of income approach. The Court adopted the so-called

"Delaware Rule," under which a dissenter's shares are valued using all three methods, "assigning such weight to each method as may be appropriate considering the type of business, the objectives of the corporation, and other relevant factors." 654 S.W.2d at 666.

In *Wallace v. Wallace*, *supra*, this court examined the appropriate method for valuing a closely-held corporation for the purpose of distributing marital assets. Noting that in *Blasingame* the Supreme Court had recognized three acceptable methods, we held there were other methods and that "[t]he choice of the proper method or combination of methods depends upon the unique circumstances of each corporation." 733 S.W.2d at 107. While recognizing that a consistent approach to the valuation of this type of marital asset had not been established, we approved Rev. Rul. 59-60, 1959-1 C.B. 237 as providing the most comprehensive guide to making this determination. *Wallace*, 733 S.W.2d at 107. This court nonetheless cautioned that that ruling was to be a guide, not an inflexible rule. *Id.* The methodology specifically approved includes consideration of nine factors:

> (1) the nature of the business, including its history since organization,
> (2) the economic status of the industry and the nation at the critical date of valuation,
> (3) book value,
> (4) earnings,
> (5) dividends and dividend paying capacity
> (6) the existence or lack of good will or other intangible value,
> (7) sales of the stock and the size of the block to be valued,
> (8) the selling price of comparable securities relative to their earnings, dividends and asset values,
> (9) the life insurance proceeds received by a corporate beneficiary on a policy covering the sole or controlling stockholder.

*Wallace*, 733 S.W.2d at 108.

As the courts have continued to emphasize, the valuation method chosen should be the one most applicable to the specific business at issue in view of all the circumstances. In *Hazard v. Hazard*, 833 S.W.2d 911, 914 (Tenn. Ct. App. 1991), we were faced with the question of how to value the medical practice of a divorcing husband. At trial, the husband's expert valued the practice at $42,818. His valuation was based upon the value of the accounts receivable, cash on hand, equipment, fixtures, office equipment and supplies and the active and inactive medical charts.

The wife's expert CPA concluded that the practice was worth $629,000. He testified that he used all three methods for valuing the practice, but his result appeared to have been based entirely on the revenue it generated. This court criticized his method, noting that basing valuation entirely on past income carries an unspoken implication that the income will remain the same. We ultimately adopted the husband's figure of $42,818, reasoning that,

-10-

[t]o use the gross income approach to determine the value of his medical practice would in effect be placing a value on the future performance of the practice. Such future performance is dependent on many factors which may or may not materialize and a valuation based on present income is highly speculative.

833 S.W.2d at 915.

## VI. ANALYSIS

In the final analysis, the equity or fairness of a particular distribution of marital property and marital debt depends upon its results in view of the overall situation. *King*, 986 S.W.2d at 219; *Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1998). Ms. Edenfield's primary complaint is that the trial court's award of the one-half interest in First Choice, which is without value due to Mr. Edenfield's refusal to continue to work for First Choice and Mr. Lewis's refusal to continue with her as co-owner, along with the $50,000 debt incurred to obtain that interest was inequitable.

She argues that the trial court should have granted her motion to alter or amend the judgment or at least given her an opportunity to prove that Mr. Edenfield had taken actions to destroy the value of First Choice by starting a competing company with Scott Lewis and disparaging her to customers. She relies on *Loyd v. Loyd*, 860 S.W.2d 409 (Tenn. Ct. App. 1993), a case with remarkable similarities to the case before us.

In *Loyd*, the parties were the owners and operators of a business called Loyd's Telephone. The wife did office work, and the husband sold and installed telephone systems. The wife filed for divorce. At trial, the wife's expert valued the company at $287,900 and the husband's expert valued it at $52,700. The court then sent a letter to the parties' attorneys, which declared it was adopting the wife's valuation, and awarding the business to her.

The wife subsequently filed a "motion to reconsider," asserting that since the court's ruling, husband had founded a new company and had "systematically drained all value from the business" by using customer lists and other information from Loyd's, in essence transferring its business to a new company. Since the final decree had not yet been entered, the trial court conducted another hearing, at which the wife's expert returned to testify that because of the husband's activities, Loyd's Telephone now had a negative value.

Despite this testimony, the trial court's final decree contained the same finding as to the valuation of Loyd's Telephone and the same disposition of the property as did its letter ruling. On appeal, this court held that the evidence in the case supported the trial court's conclusion that the business had a value of $287,884 in the hands of the husband. We found, however, that the company had a much lower value in the hands of the wife, because she did not have the technical expertise to operate it and because the husband was operating a business in direct competition with it. We

therefore reversed the trial court, concluding that "an equitable distribution of the estate necessarily involves an award of the business to the husband." *Loyd*, 860 S.W.2d at 412.

It is well settled that a former spouse's actions that reduce or destroy the value of property awarded to the other spouse in a divorce can result in alteration of the property division, *Loyd*, 860 S.W.2d at 412, or in the award of damages to the spouse who is deprived of the property or its value. *Elliott v. Elliott*, 149 S.W.3d 77, 86 (Tenn. Ct. App. 2004) ( holding that the husband impermissibly impeded the division of marital property and that wife was entitled to recover damages as a result). Ms. Edenfield's affidavit included enough facts to justify a hearing to determine whether such a situation existed and whether it justified relief.

On appeal, Mr. Edenfield argues that Ms. Edenfield was not entitled to relief from the judgment because, based on the testimony at trial she should have anticipated that Mr. Edenfield would re-enter the field of sales to car dealerships and that he and Mr. Lewis would start a new business selling the same products as First Choice. We decline to attribute that degree of foreknowledge to Ms. Edenfield based upon the record. Nonetheless, as discussed below, we think the evidence at trial indicated that the company's worth and viability were dependent upon the efforts of Mr. Lewis and Mr. Edenfield.

Not only did Ms. Edenfield file a motion to alter or amend after the final judgment was entered, she also asked the court to reconsider its original proposal to award First Choice to her shortly after the memorandum opinion containing that proposed distribution was entered. She alleged Mr. Edenfield had left employment with First Choice and that Mr. Lewis had refused to continue the business with her as a partner. Ms. Edenfield also alleged Mr. Edenfield had not transferred the stock certificates to her and that First Choice had been administratively dissolved prior to the divorce hearing. Ms. Edenfield was not given a hearing to prove these allegations, even though Mr. Edenfield agreed to the basic facts she alleged.

In the hearing on that motion, the trial court commented that it looked like the business had no value and that "in retrospect," Mr. Edenfield's accountant may have been correct in his valuation opinion. While the court suggested the parties attempt to resolve the issue prior to entry of a final judgment, it ended up awarding the interest in the business to Ms. Edenfield, along with the debt associated with its acquisition, and to use the value originally assigned to it to deny other relief to Ms. Edenfield. Since the court had not yet entered a final order, it had the authority and discretion to reconsider and modify its preliminary ruling and/or to order that additional testimony be taken as to the value of First Choice. *See* Tenn. R. Civ. P. 54.02. It did neither, even though its comments indicate it no longer was convinced of the value assigned.

The developments after the court's proposed disposition but before the entry of the final order certainly called into question the equity of the overall distribution of assets and debts. They also point out the problem with the court's initial valuation of the one-half share in the business. The other co-owner declined to continue in business with Ms. Edenfield as co-owner or partner, indicated he would dissolve the corporation, and declined to continue to work for First Choice. The possibility

that he would take these actions was foreseeable since the reason for the buy/sell agreements had been to protect each co-owner of First Choice from having to unwillingly work with the other's spouse. We note that Ms. Edenfield's expert was not asked how the value of the company would be affected by dissolution of the corporation or the refusal to the other co-owner to continue in business with Ms. Edenfield.

Thus, although we think the trial court should have given Ms. Edenfield a hearing on her motion to alter or amend and modify the distribution of assets and debts if the evidence showed, as her affidavit claimed, that Mr. Edenfield had destroyed any value in the company; and although we also think the court should have changed its initial proposed award if, as a result of the hearing before the final order was entered, it became convinced the business was valueless; we are convinced that the basic problem originated with the court's valuation of the one-half interest in the business in the hands of Ms. Edenfield.

In view of the trial testimony regarding the nature of the business, we conclude that the evidence preponderated against the trial court's valuation of the one-half interest in First Choice if that interest were transferred to Ms. Edenfield. "Valuation decisions will be set aside on appeal, even if within the range of proof, if they are contrary to a preponderance of the evidence." *Loyd*, 860 S.W.2d at 411. Like the court in *Loyd*, we are convinced that whatever the value of First Choice in the hands of the original co-owners, that value was dependent upon the efforts of and relationships established by them. Mr. Edenfield's testimony made that clear. He insisted that the business was himself and his partner. He depended on his personal relationships with car dealers to maintain the business's customer base. Mr. Edenfield's testimony at trial is instructive in this regard:

> . . . Our company is us. No different than anybody else in the service business. . . . I offered to give Kara this business. I will still do it today. She can have it. But she couldn't do it. You couldn't do it, You couldn't pay a dollar for it. Nobody would, because they can't do it. I am my business.
>
> Q.     Okay. So it's basically a job?
>
> A.     Yes.

The evidence shows that the business itself had no assets and was simply a mechanism through which its co-owners earned a living. Mr. Edenfield's description is important to the choice of the most appropriate valuation methodology, and the method used by Ms. Edenfield's expert is questionable in light of the actual facts of the company. Like the medical practice in *Hazard*, First Choice relied on the personal efforts of its principals. Because of the nature of its business, the future income of First Choice was subject to even more uncertainty.[3]

_____

[3] In fact, Mr. Edenfield testified that several major dealerships had discontinued buying from his company in the months leading up to the hearing. His testimony addressed some of the factors set out in *Wallace*. When asked if the
(continued...)

While Ms. Edenfield's expert witness showed some awareness of the three methods discussed in *Blasingame*, he relied on only one to reach his conclusion. Asked why he selected the capitalization of income method, Mr. Hulen testified, "[w]ell, the other methods involve assets, which this corporation doesn't have and, some of the other, I can't remember exactly why, but this one fit." We disagree. As set out earlier, our courts have consistently stated that the valuation method must give appropriate weight to the facts of the business itself. *See White v. White*, 1991 WL 116537, at *3 (Tenn. Ct. App. July 2, 1991) (holding that where valuation gave great weight to unreliable market price estimate, the valuation could not be considered). While a court may choose a valuation within the range of evidence, that range must be established by credible evidence, and the value chosen must be a reasonable one.

As Ms. Edenfield points out, several cases from other jurisdictions have held that it is usually inappropriate to award one spouse's partial interest in a closely-held business to the other spouse, because it would be unfair to the other shareholders in the business, and would likely lead to friction with them. *Grace v. Grace,* 380 N.W.2d 280, 285 (Neb. 1986); *Glorfield v. Glorfield,* 617 P.2d 1051, 1054 (Wash. App. 1980). Tennessee courts have similarly recognized the advisability of awarding an ongoing business to the spouse who has the expertise required to continue operating it. *See*, *e.g.*, *Sickler v. Sickler*, No. 01-A-01-9710-CV-0057, 1999 WL 270186, at *6 (Tenn. Ct. App. May 5, 1999) (holding that court had no interest in forcing the parties to maintain a business relationship and that an equitable distribution required that the interest in the business be awarded to the party with the expertise and experience to conduct it.)

One purpose of property division in divorce is to separate the financial affairs of the parties so they can both pursue their own lives, free, insofar as possible, from unwanted entanglements with each other's affairs. *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998). Awarding Ms. Edenfield one-half interest in the company that employed Mr. Edenfield was not consistent with that goal, and he ceased being an employee. Similarly, it was clear from the stock purchase agreement between Mr. Lewis and Mr. Edenfield that Mr. Lewis had absolutely no interest in having Ms. Edenfield as a business partner and had taken steps to prevent that occurrence in the event of Mr. Edenfield's death. Again, expecting another party to continue in a business relationship he did not want was unrealistic.

We conclude that First Choice had little or no value in and of itself and certainly had no value in the hands of Ms. Edenfield. Its award to either spouse would make no difference to the justness of the property distribution. Because of the time that has passed since the parties were divorced, the changes in their situations, and the fact that First Choice is now essentially nonexistent, we see no point in changing the award of one-half interest in First Choice to Ms. Edenfield, especially since we have concluded its value of zero was attributable in large part to the court's award of it to her.

---

[3](...continued)
company had a positive balance, he replied, "At this point in time, there is no positive balance of the company."

-14-

However, valuing the interest at zero does affect the justness of the allocation of the debt incurred to purchase the one-half interest in the business. While debts often follow the asset associated with them, *King*, 986 S.W.2d at 219, that principle has no real application when the asset has no value. The question is whether the court's allocation of the $50,000 debt associated with the acquisition of the interest in First Choice should be modified. We conclude that it is clearly inequitable to impose the entire debt on Ms. Edenfield in view of the overall distribution of assets and debts. However, we are not convinced that it would be equitable to assign the entire amount to Mr. Edenfield either.

We are convinced that Mr. Edenfield accurately described First Choice as primarily a source of employment. The $50,000 investment allowed him to earn a salary, and both parties enjoyed to benefits of that income during the marriage. It provided the basis for the amount of support he was ordered to pay upon divorce. Had he continued to work for First Choice, that salary would have provided the source for the support payments he was ordered to make.

We hold that an equitable distribution of property and allocation of debts requires that the $50,000 debt incurred for the purchase of the one-half interest in First Choice be allocated equally between the parties. Consequently, Ms. Edenfield is entitled to a judgment for that amount against Mr. Edenfield. On remand, the trial court shall fix the exact amount and the appropriate method of payment.

Because of our resolution of the issues surrounding First Choice, we decline to make any other adjustments in the trial court's award of property and debt.

## VII. ATTORNEY FEES

An award of attorney's fees in divorce cases is considered alimony or spousal support, generally characterized as alimony *in solido*. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996); *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992).

Because attorney's fees are considered alimony or spousal support, an award of such fees is subject to the same factors that must be considered in the award of any other type of alimony. *Yount*, 91 S.W.3d at 783; *Lindsey v. Lindsey*, 976 S.W.2d 175, 181 (Tenn. Ct. App. 1997). Therefore, the statutory factors listed in Tenn. Code Ann. § 36-5-101(d)(1) are to be considered in a determination of whether to award attorney's fees. *Langschmidt v. Langschmidt,* 81 S.W.3d 741, 751 (Tenn. 2002); *Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995); *Houghland*, 844 S.W.2d at 623.[4] One

---

[4] Among these factors, the two considered to be the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson v. Robertson*, 76 S.W.3d 337, 342 (Tenn. 2002).

of those factors is"[t]he provisions made with regard to the marital property as defined in § 36-4-121." Tenn. Code Ann. § 36-5-101(d)(1).

The trial court herein expressly relied on that factor, declining to award attorney fees to Ms. Edenfield because she received property "valued in excess of $340,000." This reasoning is not only consistent with the statutory factor, but is also in accord with judicial holdings. Recently, the Supreme Court reaffirmed that an award of attorney's fees "is conditioned upon a lack of resources to prosecute or defend a suit in good faith . . ." and that such an award is to ensure access to the courts. *Langschmidt*, 81 S.W.3d at 751, quoting *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983). Consequently, a spouse with adequate property and income is not entitled to an award of additional alimony to compensate for attorney's fees and expenses. *Lindsey*, 976 S.W.2d at 181; *Duncan v. Duncan*, 686 S.W.2d 568, 573 (Tenn. Ct. App. 1984). If a party has adequate property and income, or is awarded adequate property in the divorce, from which to pay his or her own expenses, an award of attorney's fees may not be appropriate after consideration of all relevant factors. *Wilder*, 66 S.W.3d at 895; *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000); *Houghland*, 844 S.W.2d at 623-24; *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986). The award of attorney's fees as additional alimony is most appropriate where the divorce does not provide the obligee spouse with a source of funds, such as from property division, with which to pay his or her attorney's fees. *Yount*, 91 S.W.3d at 783.

The trial court's reasoning was sound, but we have significantly modified the valuation upon which the decision was based and, consequently, removed its factual predicate. Because a trial court has wide discretion in a decision to award attorney's fees, this court will not interfere with such an award, "except upon a showing of abuse of discretion, where the evidence preponderates against the award, and a manifest injustice will be done if the Trial Courts's decision is allowed to stand." *Wilder*, 66 S.W.3d at 894; *Long v. Long,* 957 S.W.2d 825, 829 (Tenn. Ct. App. 1997); *Kincaid*, 912 S.W.2d at 144.

Because we have removed the factual basis for the court's decision, the trial court should be given the opportunity to reconsider the question of attorney's fees on the basis of the modifications we have made. We are not necessarily saying that Ms. Edenfield must be awarded her attorney fees, but only that the court should be given the opportunity to take a second look at the question. We therefore remand this case to the trial court to consider whether Ms. Edenfield should be awarded all or some portion of the attorney fees she incurred in the course of this divorce.

## VIII. CONCLUSION

The trial court's award to Ms. Edenfield of the interest in First Choice is affirmed, but the valuation is modified to zero. Consequently, one half of the debt incurred to acquire that interest is allocated to Mr. Edenfield, to be paid as directed by the trial court on remand. The trial court's decision not to grant Ms. Edenfield any part of her attorney fees is vacated, and the trial court is directed to reconsider this issue in light of our modifications. In all other respects, the final order of the trial court is affirmed. This cause is remanded to the Chancery Court of Knox County for any

further proceedings necessary consistent with this opinion. The costs on appeal are to be divided equally and each party taxed with one half.

 

 

_____
PATRICIA J. COTTRELL, JUDGE